Robert J. Gralewski, Jr.
KIRBY McINERNEY LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 398-4340
bgralewski@kmllp.com

Timothy D. Battin
Nathan M. Cihlar
Christopher V. Le
STRAUS & BOIES, LLP
4041 Fairfax Drive, Fifth Floor
Fairfax, VA 22201
Telephone: (703) 764-8700
Facsimile: (703) 764-8704
tbattin@straus-boies.com
ncihlar@straus-boies.com
cle@straus-boies.com

Mario N. Alioto (56433)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
laurenrussell@tatp.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JINKYOUNG MOON, COREY NORRIS, CLARISSA SIMON, NIGEL WARREN on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BUMBLE BEE FOODS LLC, STARKIST COMPANY, TRI-UNION SEAFOODS LLC, and KING OSCAR, INC.<br><br>Defendants. | Case No. **'15 CV2006 H     JMA**<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Jinkyoung Moon, Corey Norris, Clarissa Simon and Nigel Warren, individually and on behalf of a Class of all those similarly situated in the United States, bring this action for damages and injunctive relief under state and federal antitrust, consumer protection and unfair competition statutes and common law against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## I.   NATURE OF THE ACTION

1.   This action arises out of a conspiracy by the three largest producers of canned tuna in the United States, its territories and the District of Columbia—Bumble Bee Foods LLC, StarKist Company, Tri-Union Seafoods LLC, and King Oscar, Inc. (collectively, "Defendants")—which began at least as early as July 2011 and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for canned tuna within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and state antitrust, consumer protection and unfair competition statutes.  As used herein, the term "canned tuna" refers to shelf-stable tuna that is sold in cans.

## II.   JURISDICTION AND VENUE

2.   This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court also has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq*., which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The $5 million amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

CLASS ACTION COMPLAINT

3.     Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district and a substantial portion of the interstate trade and commerce described below has been carried out in this district.

4.     This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered canned tuna in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## III.   __PARTIES__

### A.   __Plaintiff__

5.     Plaintiff Jinkyoung Moon is a current resident of California.  During the Class Period, Plaintiff indirectly purchased canned tuna for his own use and not for resale from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

6.     Plaintiff Clarissa Simon is a current resident of the District of Columbia.  During the Class Period, Plaintiff indirectly purchased canned tuna for her own use and not for resale from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

7.     Plaintiff Corey Norris is a current resident of North Carolina.  During the Class Period, Plaintiff indirectly purchased canned tuna for his own use and not for resale from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

8.     Plaintiff Nigel Warren is a current resident of New York.  During the Class Period, Plaintiff indirectly purchased canned tuna for his own use and not for resale from one or

more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

B. **Defendants**

9.       Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 280 10th Avenue, San Diego, CA 92101.  Bumble Bee produces and sells canned tuna throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

10.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212.  StarKist produces and sells canned tuna throughout the United States (including this District), its territories and the District of Columbia.  StarKist is privately owned by Dongwon Enterprise ("Dongwon"), based in South Korea.

11.     Defendant Tri-Union Seafoods LLC is a domestic corporation with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, CA 92121.  Tri-Union Seafoods LLC produces and sells canned tuna throughout the United States (including this District), its territories and the District of Columbia, and markets this product under the brand name Chicken of the Sea.  Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "Chicken of the Sea."

12.     Defendant King Oscar, Inc. ("King Oscar") is a domestic corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, CA 92108.  King Oscar produces and sells canned tuna throughout the United States (including this District), its territories and the District of Columbia.

13.     Defendants Chicken of the Sea and King Oscar (together, "Tri-Union") are wholly owned by Thai Union Frozen Products, a public company headquartered in Thailand.

C.     **Unnamed Co-Conspirators**

14.     On information and belief, at all relevant times, other producers of canned tuna willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

D.     **Agents**

15.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**IV.     CLASS ACTION ALLEGATIONS**

16.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following Class (the "Nationwide Class"):

> All individuals and entities that indirectly purchased canned tuna for their own use and not for resale within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between July 2011 and the present.  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

17.     Plaintiffs also bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(2) seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following classes (the "Damages Classes"):

> All individuals and entities that indirectly purchased canned tuna for their own use and not for resale in the Indirect Purchaser States[1] from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between July 2011 and the present.  Excluded from the class are governmental entities, Defendants, any parent,

---

[1] The Indirect Purchaser States are the states listed in Counts II and III, and each state class comprises individuals and entities that have made indirect purchases of Defendants' canned tuna in the state.

subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

18.     The Nationwide Class and the Damages Classes are referred to herein as the "Classes."

19.     Plaintiffs do not know the exact number of members of the Classes because such information is in the exclusive control of the Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

20.     There are questions of law and fact which are common to the claims of Plaintiffs and the Classes, including, but not limited to:

a.      Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the price for canned tuna;

b.      Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the price for canned tuna;

c.      The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the price for canned tuna;

d.      Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Classes, and, if so, the appropriate measure of damages; and

6

CLASS ACTION COMPLAINT

g.      Whether Plaintiffs and members of the Classes are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

21.      These and other questions of law and fact common to the members of the Classes predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages.

22.      Plaintiffs' claims are typical of the claims of the members of the Classes.

23.      Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs have no interests that are antagonistic to other members of the Classes and have retained competent counsel experienced in antitrust, class action, and other complex litigation.

24.      This class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.      The Classes are readily definable and are Classes for which purchase records should exist.

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.      Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

25.      This class action presents no difficulties of management that would preclude its maintenance as a class action.

**V.      INTERSTATE TRADE AND COMMERCE**

26.      Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale of canned tuna in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

27.      Throughout the Class Period, Defendants transported substantial amounts of canned tuna in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

28.      Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

**VI.      FACTUAL ALLEGATIONS**

**A.      Overview of the Canned Tuna Industry.**

29.      Canned tuna is composed of raw tuna that is processed to preserve and enhance flavor, and ensure product safety.  Because it is typically caught offshore, raw tuna is usually delivered to canneries frozen or refrigerated.

30.      Upon delivery to a processing plant, a quality control inspection is performed to ensure the tuna was stored and transported at the proper temperature and is in acceptable condition.  According to the Starkist website, tuna passing the initial quality control inspection is then pre-cooked or steamed in large wire baskets and allowed to cool. Next, each fish is cleaned and the meat is separated from the skin and bones.  The cleaned loins are then conveyed to the filling machines that prepare solid-pack tuna, or to the "chopper" used to prepare chunk-style tuna.

31.      Depending on the style, precise amounts of salt, vegetable broth, water, or pure vegetable oil may be added and the can is then sealed.

32.     Each can is affixed with a permanent production code identifying plant, product, date packed, batch, and other information.  Filled and sealed packages are then cooked under pressure to make the products commercially sterile and give them a long shelf life.

33.     Canned tuna is sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others.

34.     According to a May 2012 presentation by Bumble Bee, the total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012.  In one report, Bumble Bee estimated that canned tuna represents 73% of this value.  In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

35.     Defendants are the three largest domestic manufacturers in the highly concentrated market for canned tuna.  According to the aforementioned presentation by Bumble Bee, StarKist had 34.6% of the market for shelf-stable tuna, Bumble Bee had 27.8% and Chicken of the Sea had 19.4%.  In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for Chicken of the Sea, 25% for Bumble Bee, and 36% for StarKist.  Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and Chicken of the Sea at 20%.

36.     This oligopolistic structure within the industry is the result of recent mergers and acquisitions.  For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which Thai Union Frozen Products was a member.  Thereafter, Thai Union Frozen Products bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC.  In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million.  Similarly, in 2014, Thai Union Frozen Products bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States.  And in December

of 2014, Thai Union Frozen Products announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion.

37.     The combination of Chicken of the Sea, the third largest U.S. canned tuna brand, and Bumble Bee, the second largest U.S. canned tuna brand, would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist.  Thai Union Frozen Products had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.  However, according to the Bangkok Post, Thai Union Frozen Products suspended its share offering in light of a United States Department of Justice ("DOJ") antitrust probe.

### B.     The Department of Justice Investigation.

38.     The San Francisco office of the antitrust division of the DOJ is conducting an investigation into anticompetitive practices in the United States canned tuna industry. The DOJ has convened a grand jury. Two of the three largest United States canned tuna manufacturers, Tri-Union and Bumble Bee, have publicly confirmed receipt of grand jury subpoenas.

39.     As noted above, on July 23, 2015, Thai Union Frozen Products suspended a preferential public offering in light of the grand jury investigation commenced by the DOJ.  Thai Union Frozen Products disclosed on that day that both Bumble Bee and Chicken of the Sea had received grand jury subpoenas relating to an antitrust investigation of canned tuna.  The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ."  The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.

He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

40.     The article goes on to state:

An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analyzing deals.

It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

****

The source said others in the industry are now anticipating that they too will be subpoenaed….

41.     Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic canned tuna sector.

42.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82.  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83.  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*.

CLASS ACTION COMPLAINT

**C.      The Structure and Characteristics of the Canned Tuna Market Render the Conspiracy Plausible.**

43.      The structure and characteristics of the canned tuna market in the United States are conducive to a price-fixing agreement.  In fact, as set forth below, the United States canned tuna market exhibits many characteristics that economists recognize facilitate collusion, including the commodity product, substantial barriers to entry, high market concentration, lack of substitutes and highly inelastic demand.

44.      Canned tuna is a commodity product that is sold directly to retail chains and through grocery wholesalers and distributors.  Canned tuna varieties have similar shelf life, contain similar amounts of tuna, and are marketed in cans.  The industry has also developed a definition for a standard case of canned tuna: 48 6.5-ounce cans for a chunk style pack, 48 7-ounce cans for a solid pack, or 48 6-ounce cans for a flaked and grated pack.  Thus, purchasers of canned tuna are more likely to be influenced by price when making a purchasing decision.

45.      There are substantial barriers that preclude, or reduce, entry into the canned tuna product market, including high start-up costs, manufacturing expertise, access to raw materials, and access to distribution channels. Therefore, Defendants could collectively raise prices without fear of being undercut by new entrants.

46.      Purchasers routinely source their canned tuna from one of the three Defendants. As a result, Defendants dominate the United States canned tuna market.

47.      Defendants collectively possessed significant market power to raise prices for canned tuna above competitive levels in the United States in accordance with an anticompetitive agreement.

48.     There are no economically reasonable substitutes for canned tuna. Alternative tuna, such as frozen tuna or fresh tuna, do not have commensurate shelf lives and require preparation, such as cooking, before they can be consumed.

49.     Demand for canned tuna is highly inelastic. An article in the Journal of International Food & Agribusiness Marketing calculated a price elasticity of demand coefficient of -0.3, which it says is consistent with "a consumer product widely viewed as almost a necessity in a well-stocked pantry."[2]  In 2010, the UN's Food and Agriculture Organization also concluded that "demand for canned tuna is rather inelastic, which provides opportunities for market power at the retail level."

50.     There are also economic indications that support the conclusion that there was collusive pricing within the domestic canned tuna industry.

51.     Consumption of canned tuna has declined over the last ten years in the United States.  The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013.  An article in the *Washington Post* graphically represented this decline by measuring United States annual per capita consumption from 1930 to 2010:



---

[2] Ronald A. Babula & Roger L. Corey Jr. (2004) U.S. Canned Tuna Supply and Demand, Journal of International Food & Agribusiness Marketing, 16:2, 145-164, available at http://dx.doi.org/10.1300/J047v16n02_09.

The same article also presented the following graph, showing that while Americans are buying less canned seafood, which includes canned tuna, they are paying more for what they do buy:



52.     Given this decline in consumption, one would expect rational businesses to reduce the prices for canned tuna, but that did not happen.  The following chart, taken from data available from a Globefish Commodity Update, depicts monthly prices for canned tuna in brine prices into the US from July 2011 through March 2014.



Source: Globefish Commodity Update Tuna May 2014 pp.12-13

53.     A recent report by Globefish.org likewise notes that U.S. canned tuna prices have increased as demand has decreased:

> The US canned tuna market continues declining as a result of weakening household demand. . . . For the 52 weeks ending March 2014, consumption was reported at 65.9% compared with 68.1% recording during the same period of 2010. Sale volumes of shelf stable tuna during the reporting period also declined from USD 30.8 million (equivalent to 27.3 million cases), excluding sales in the catering sector. However, in value terms sales were stable at around USD 1.68 billion, reflecting the increase in canned tuna prices.

54.     Raw material costs do not adequately explain these price increases.  While the cost of skipjack tuna rose from 2011 to early 2013, it declined precipitously thereafter, as shown in the following chart:



55.     According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok.  But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year."  Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1,400 to $800.  And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report that raw tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low."  The following chart, showing the FAO fish and Atuna Skipjack tuna price index from April 2000 to April 2015, depicts the recent declining raw material costs.

CLASS ACTION COMPLAINT

56.     *Undercurrent* also reported on these recent low skipjack prices:



57.     Despite these drastically declining raw material costs, Defendants did not decrease prices to try to obtain more market share.

58.     Thai Union Frozen Products' Annual Reports discuss this situation.  In its 2013 Annual Report, Thai Union Frozen Products stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*."  (Emphasis added).  It stated in the same report that its future profit margins would depend upon "*[r]easonable US canned tuna competition without unnecessary price*."  (Emphasis added).  In its 2014 Annual Report, Thai Union Frozen Products explicitly noted that this goal had been achieved.  It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)*
> and generally lower fish Chicken of the Sea, *our own tuna brands*

> *marked a great year of increased profitability.*  Despite minimal
> sales growth in the US, competitive inventory cost and reasonable
> market conditions helped lift the margin of our US brand.
> (Emphases added).

The same report went on to note that "*sensible market competition,* supported by lower

raw material costs, made it possible for our own tuna brands to expand their margins through the

year despite limited volume growth." (Emphasis added).  It indicated that future revenue growth

would again be dependent upon "*[r]easonable US canned tuna market competition that focuses*

*more on consumption creation than market share alone*." (Emphasis added).  It attributes the

improvement in the overall gross margin of tuna in 2014 to 17.0 percent (from 12.5 percent in

2013) to "gross margin expansion of branded business from lower fish costs, price adjustments

of EU operation in early 2014 as well as *rational market competition in the US*. The gross

margin of OEM tuna nevertheless increased only slightly YoY." (Emphasis added).

59.   The "reasonable market conditions," "more rational market competition,"

"sensible market competition," avoidance of battles for market share and "absence of cut throat

pricing" that the reports note could only have come about through collusion.  It would have been

against the individual self-interest of each Defendant to eschew increasing market share during

this period by lowering prices.

60.   There were numerous business opportunities for Defendants to meet and engage

in such collusion.  One such opportunity is provided by the Tuna Council.  As explained on that

organization's website:

> The National Fisheries Institute's Tuna Council represents the
> largest processors and household names for canned and pouch tuna
> in the U.S. including *Bumble Bee*®, *Chicken of the Sea*® and
> *StarKist*®.  The Tuna Council speaks for the tuna industry on
> numerous issues including food safety, labeling, sustainability,
> nutrition education and product marketing.

61.   An example of such joint conduct is provided by the "Tuna the Wonderfish"

advertising campaign of 2011-12.  This campaign was bankrolled by the Defendants and carried

out under the auspices of the Tuna Council with the support of Thai processors.  In it, the

Defendants teamed up for marketing purposes.  Joe Tuza, Senior Vice-President of Marketing

CLASS ACTION COMPLAINT

for StarKist, reportedly said that "[w]e worked together surprisingly well."  He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three Defendant companies.  The same philosophy appears to undergird the alleged price-fixing conspiracy.

62.     Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and Chicken of the Sea.  Bumble Bee copacks for Chicken of the Sea at the former's plant located in Santa Fe Springs, California with respect to West Coast sales.  Chicken of the Sea does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales.  Thus, even before their proposed merger, these two companies were cooperating closely.  These interlocking relationships provided an excellent opportunity to collude on pricing and produce easily substitutable goods.

**D.     Defendants' Anticompetitive Conduct.**

63.     On information and belief, Defendants Tri-Union, Bumble Bee and StarKist participated in anticompetitive activities beginning at least as early as July 2011 and continuing to the present.  These activities included telephone calls, and frequent in-person meetings at specified locations, including hotels and restaurants.  During these meetings and calls, Defendants shared sensitive business information, and entered into agreements to fix, raise, stabilize, and maintain prices of canned tuna sold to consumers in the United States.

64.     On information and belief, senior executives of Defendants met at least twice a year.

65.     On information and belief, at other times, top executives regularly discussed prices and shared sensitive customer information.

66.     On information and belief, throughout the Class Period, Defendants communicated regularly by telephone to discuss prices and sensitive customer information. For example, during at least one telephone conversation between Bumble Bee and StarKist

executives, StarKist informed Bumble Bee that StarKist and Tri-Union were in agreement to raise prices.

67.     On information and belief, Defendants discussed pricing, and agreed to coordinate the timing and amount of price increases for canned tuna sold to customers in the United States. Defendants also agreed to restrict capacity and allocate customers.

68.     On information and belief, Defendants agreed to exchange, and did exchange, information during their telephone conversations and meetings for the purpose of monitoring and enforcing adherence to their agreements.

**E.     Plaintiffs Suffered Antitrust Injury.**

69.     Defendants' conspiracy had the following effects, among others:

        a.      Price competition has been restrained or eliminated with respect to canned tuna; and

        b.      The price of canned tuna has been fixed, raised, maintained, or stabilized at an artificially inflated level.

70.     During the Class Period, Defendants charged supra-competitive prices for canned tuna sold to Plaintiffs. By reason of Defendants' alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury, having paid higher prices for canned tuna than they would have paid absent Defendants' alleged illegal contract, combination or conspiracy, and, as a result, have suffered damages in an amount to be determined.  This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

71.     Canned tuna is an identifiable, discrete product that remains unchanged from the point at which it is sold by Defendants until it reaches Plaintiffs and the Classes.  Canned tuna follows a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and price and cost changes attributable to Defendants' price-fixing conspiracy can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

72.     Just as canned tuna can be physically traced through the supply chain, its price can be traced to show that changes in the prices paid by direct purchasers of canned tuna affect prices paid by the indirect purchasers of canned tuna in the chain of distribution.

73.     The economic necessity of passing through cost changes increases with the degree of competition a firm faces.  The wholesale, distributor, club warehouse, retail grocery, grocery cooperative, mass merchandiser and drug store market for canned tuna are subject to vigorous price competition.  The aforementioned market participants have thin net margins, and are therefore at the mercy of their product costs, such that increases in the price of canned tuna leads to corresponding increases in prices to their customers.  When downstream distribution markets are highly competitive, as they are in the case of canned tuna, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and members of the Classes.

74.     Hence the inflated prices of canned tuna resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by wholesalers, distributors and retailers.

75.     Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[3]

76.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser

---

[3] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

CLASS ACTION COMPLAINT

cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers… Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[4]

77.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of an upstream price increase on product prices down the chain of distribution.

78.    Defendants' overcharges impacting the price of canned tuna through the chain of their distribution can be measured and quantified.  Commonly used and well accepted economic models can be used to measure both the existence and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

### F.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims.

79.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before this litigation commenced.

---

[4] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106 (Cal. Sup. Ct. Aug. 29, 2000).

80.     Plaintiffs and the members of the Classes are consumers who purchased canned tuna. They had no direct contact or interaction with the Defendants and had no means from which they could have discovered the combination and conspiracy described in this Complaint prior to shortly before this litigation was commenced.

81.     No information in the public domain was available to Plaintiffs and the members of the Classes prior to public disclosure of the DOJ's investigation of the canned tuna industry, which only recently revealed sufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for canned tuna. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with direct purchasers of such products, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

82.     For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and members of the Classes have alleged in this Complaint.

**G.     Defendants' Fraudulent Concealment Tolled the Statute of Limitations.**

83.     Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Classes.

84.     Plaintiffs and members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced. Nor could Plaintiffs and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. In addition, the conspiracy was by its nature self-concealing.

CLASS ACTION COMPLAINT

85.     Defendants engaged in a successful, illegal price-fixing conspiracy with respect to canned tuna, which they affirmatively concealed, in at least the following respects:

a.      By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so; and

b.      By agreeing on other means to avoid detection of their illegal conspiracy to fix the price of canned tuna.

86.     As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the Classes assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and members of the Classes.

## VII.    CAUSES OF ACTION

### First Cause of Action.

### CLAIM FOR VIOLATIONS OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)

87.     Plaintiffs incorporate and reallege all of the above allegations as if fully set forth herein.

88.     Beginning in July 2011 and continuing to the present, Defendants and their co-conspirators entered into and engaged in a continuing contract, combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the price of canned tuna within the United States, its territories, and the District of Columbia in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

89.     Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the price of such canned tuna.

CLASS ACTION COMPLAINT

90.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of canned tuna.

91.     The illegal combination and conspiracy alleged herein had the following effects, among others:

        a.     The prices charged by Defendants to, and paid by, Plaintiffs and members of the Classes for canned tuna were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

        b.     Plaintiffs and members of the Classes have been deprived of free and open competition in the purchase of canned tuna;

        c.     Plaintiffs and members of the Classes have been required to pay more for canned tuna than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

        d.     Competition in the sale of canned tuna has been restrained, suppressed or eliminated.

92.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the other members of the Classes have been injured and damaged in their business and property in an amount to be determined according to proof.

93.     Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant market for purposes of this action is the canned tuna market.  The relevant geographic market is the United States.  The Manufacturer Defendants possess market power in the domestic market for canned tuna.  Collectively, they control roughly 78% of that market.

94.     These violations are continuing and will continue unless enjoined by this Court.

95.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Classes seek treble damages, attorneys' fees and costs, and the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**Second Cause of Action.**

**CLAIM FOR VIOLATIONS OF STATE ANTITRUST STATUTES.**

96.     Plaintiffs reallege and incorporate by reference all the above allegations as if fully set forth herein.

97.     Plaintiffs further allege that Defendants' anticompetitive acts described herein were knowing, willful and constitute violations of the following state antitrust statutes:

98.     Arizona Rev. Stat., §§ 44-1401, *et seq*:

   a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Arizona.

   b.     Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Arizona; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; and (3) Arizona Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

   c.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

   d.     As a direct and proximate result of Defendants' unlawful conduct, Arizona Purchasers have been injured in their business and property and are threatened with further injury.

25

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq.*[5] Accordingly, Arizona Purchasers seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

99.     Section 16720, *et seq.* of the California Business and Professions Code:

a.      Beginning at a time presently unknown to Plaintiffs, but at least as early as July 2011, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, and each of them, have acted to fix, raise, stabilize and maintain prices of canned tuna at supra-competitive levels in violation of Section 16720.

b.      The aforesaid violations of Section 16720, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of, and to allocate the market for canned tuna.

c.      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: (1) fixing, raising, stabilizing and/or maintaining the price of canned tuna; and (2) allocating among themselves the production of canned tuna.

---

[5] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiffs mailed a copy of this Complaint to the Arizona Attorney General.

CLASS ACTION COMPLAINT

d.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of canned tuna has been restrained, suppressed and/or eliminated in the State of California; (2) price for canned tuna sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and (3) those who purchased canned tuna directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and California Purchasers have been injured in their business and property in that they paid more for canned tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 *et seq.* of the California Business and Professions Code, Plaintiffs and the California Purchasers seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

100.    District of Columbia Code Ann. §§ 28-4501, *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in the District of Columbia.

b.      Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the

CLASS ACTION COMPLAINT

District of Columbia; (3) District of Columbia Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, District of Columbia Purchasers have been injured in their business and property and are threatened with further injury

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, District of Columbia Purchasers seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

101.  Hawaii Code, H.R.S. § 480-4:

a.  During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Hawaii.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Hawaii purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

CLASS ACTION COMPLAINT

d.  As a direct and proximate result of Defendants' unlawful conduct, Hawaii Purchasers have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Code, H.R.S. § 480-4.[6] Accordingly, Hawaii purchasers seek all forms of relief available under Hawaii Code, H.R.S. § 480-1 *et seq.*

102.  Iowa Code §§ 553.1 *et seq*:

a.  During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Iowa.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout the Iowa; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Iowa; (3) Iowa Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Iowa Purchasers have been injured in their business and property and are threatened with further injury.

---

[6] In compliance with Hawaii Rev. Stat. § 480-13.3, Plaintiffs served a copy of this Complaint on the Hawaii Attorney General.

29

CLASS ACTION COMPLAINT

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq.*  Accordingly, Iowa Purchasers seek all forms of relief available under Iowa Code §§ 553.1.

103.    Kansas Stat. Ann. §§50-101 *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Kansas.

b.      Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Kansas; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Kansas Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Kansas Purchasers have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq*. Accordingly, Kansas Purchasers seek all forms of relief available under Kansas Stat. Ann. §§50-101 *et seq*.

104.    Maine Rev. Stat. Ann. 10, §§1101 *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

30

CLASS ACTION COMPLAINT

maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Maine.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Maine; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Maine Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, members of the Maine Purchasers have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq*. Accordingly, Maine purchasers seek all forms of relief available under Maine Rev. Stat. Ann. 10, §§1101 *et seq*.

105.  Michigan Comp. Laws Ann. §§ 445.771 *et seq*:

a.  During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Michigan.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Michigan; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan;

(3) Michigan Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Michigan Purchasers have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.*  Accordingly, Michigan Purchasers seek all forms of relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

106.   Minnesota Stat. §§ 325D.50 *et seq*:

a.    During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Minnesota.

b.    Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Minnesota Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, members of the Minnesota Purchasers have been injured in their business and property and are threatened with further injury.

CLASS ACTION COMPLAINT

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq*. Accordingly, Minnesota purchasers seek all forms of relief available under Minnesota Stat. §§ 325D.50 *et seq*.

107.    Mississippi Code Ann. §75-21-1 *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Mississippi.

b.      Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Mississippi Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Mississippi Purchasers have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §75-21-1 *et seq*. Accordingly, Mississippi Purchasers seek all forms of relief available under Mississippi Code Ann. §75-21-1 *et seq*.

108.    Nevada Rev. Stat. Ann. §§ 598A *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

CLASS ACTION COMPLAINT

maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Nevada.

b.    Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Nevada; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Nevada Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Nevada Purchasers have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*[7] Accordingly, Nevada Purchasers seek all forms of relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq*.

109.    New Mexico Stat. Ann. §§ 57-1-1 *et seq*:

a.    During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in New Mexico.

b.    Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated

---

[7] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 598A.210(3), Plaintiffs mailed a copy of this Complaint to the Nevada Attorney General.

CLASS ACTION COMPLAINT

throughout New Mexico; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) New Mexico Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, New Mexico Purchasers have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq*. Accordingly, New Mexico Purchasers seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq*.

110. New York General Business Law § 340 *et seq*:

a. During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in New York.

b. Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout New York; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c. During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

CLASS ACTION COMPLAINT

d.  As a direct and proximate result of Defendants' unlawful conduct, New York Purchasers have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York General Business Law § 340 *et seq.* Accordingly, New York Purchasers seek all forms of relief available under New York G.B.L. § 340 *et seq.*[8]

111.  North Carolina Gen. Stat. §§ 75-1 *et seq*:

a.  During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in North Carolina.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, North Carolina Purchasers have been injured in their business and property and are threatened with further injury.

---

[8] In accordance with New York G.B.L. § 340.5, Plaintiffs served a copy of this Complaint on the New York Attorney General.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq*. Accordingly, North Carolina Purchasers seek all forms of relief available under North Carolina Gen. Stat. §§ 75-1 *et seq*.

112.   North Dakota Cent. Code §§ 51-08.1-01 *et seq*:

a.   During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which canned tuna was sold, distributed or obtained in North Dakota.

b.   Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) North Dakota Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.   During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, North Dakota Purchasers have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. Accordingly, North Dakota Purchasers seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq*.

113.   South Dakota Codified Laws Ann. §§ 37-1 *et seq*:

a.   During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

CLASS ACTION COMPLAINT

maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in South Dakota.

b.      Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) South Dakota Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.      During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, South Dakota Purchasers have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*  Accordingly, South Dakota Purchasers seek all forms of relief available under South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

114.    Tennessee Code Ann. §§ 47-25-101 *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Tennessee.

b.      Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee;

CLASS ACTION COMPLAINT

(3) Tennessee Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Tennessee Purchasers have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Accordingly, Tennessee Purchasers seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

115.  Vermont Stat. Ann. 9 §§ 2453 *et seq*:

a.  During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Vermont.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Vermont; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Vermont Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Vermont Purchasers have been injured in their business and property and are threatened with further injury.

CLASS ACTION COMPLAINT

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq*. Accordingly, Vermont Purchasers seek all forms of relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq*.

116.   West Virginia Code §§ 47-18-1 *et seq*:

a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in West Virginia.

b.     Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) West Virginia Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.     During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, West Virginia Purchasers have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1 *et seq*. Accordingly, West Virginia Purchasers seek all forms of relief available under West Virginia Code §§ 47-18-1 *et seq*.

117.   Wisconsin Stat. §§133.01 *et seq*:

a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

CLASS ACTION COMPLAINT

maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Wisconsin.

b.  Defendants' combinations or conspiracies had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) canned tuna prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

c.  During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Wisconsin Purchasers have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq*. Accordingly, Wisconsin Purchasers seek all forms of relief available under Wisconsin Stat. §§133.01 *et seq*.

**Third Cause of Action.**

**STATE CONSUMER PROTECTION AND UNFAIR COMPETITION STATUTES**

118.  Plaintiffs incorporate and reallege all of the above allegations as if fully set forth herein.

119.  Plaintiffs further allege that Defendants' anticompetitive acts described herein constitute violations of the following state consumer protection and unfair competition statutes:

120.  Sections 17200, *et seq*. of the California Business and Professions Code:

a.  Beginning on a date unknown to Plaintiffs, but at least as early as July 2011, and continuing thereafter to the present, Defendants committed and continue to commit acts of unfair competition, as defined by Sections

17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c.     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

d.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; Defendants' act and practices are unfair to consumers of canned tuna in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

CLASS ACTION COMPLAINT

e.     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

f.     California Plaintiff and each of the California Purchasers members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

h.     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and California Purchasers to pay supra-competitive and artificially-inflated prices for canned tuna.  Plaintiff and California Purchasers suffered injury in fact and lost money or property as a result of such unfair competition.

i.     The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

j.     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiff and the California Purchasers are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §17200 *et seq*.

121.    Florida Stat. § 501.201 *et seq*:

a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or

43

maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Florida.

b.   The foregoing conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Florida Stat. § 501.204.

c.   During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

d.   Defendants' unlawful conduct had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Florida; (2) canned tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Florida Purchasers were deprived of free and open competition; and (4) Florida Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

e.   As a direct and proximate result of Defendants' conduct, Florida Purchasers have been injured and are threatened with further injury.

f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*, and accordingly, Florida Purchasers seek all relief available under that statute.

122.   Hawaii Rev. Stat. § 480-2:

a.   During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Hawaii.

b.   The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2.

44

CLASS ACTION COMPLAINT

c.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) canned tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Hawaii Purchasers were deprived of free and open competition; and (4) Hawaii Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

e.     As a direct and proximate result of Defendants' conduct, Hawaii Purchasers have been injured and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-2.  Accordingly, Hawaii Purchasers seek all relief available under Hawaii Rev Stat. § 480 *et seq*.

123.   Nebraska Rev. Stat. § 59-1602:

a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Nebraska.

b.     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout

45

CLASS ACTION COMPLAINT

Nebraska; (2) canned tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Nebraska Purchasers were deprived of free and open competition; and (4) Nebraska Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

    e.    As a direct and proximate result of Defendants' conduct, Nebraska Purchasers have been injured and are threatened with further injury.

    f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 *et seq.*, and accordingly, Nebraska Purchasers seek all relief available under that statute.

124.    New Mexico Stat. § 57-12-2E:

    a.    During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in New Mexico.

    b.    Defendants also took efforts to conceal their agreements from New Mexico Purchasers.

    c.    The foregoing conduct constitutes "unfair or deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce" within the meaning of New Mexico Stat. § 57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico Purchasers and the prices paid by them for canned tuna as set forth in New Mexico Stat. § 57-12-2E.

    d.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

CLASS ACTION COMPLAINT

e.     Defendants' unlawful conduct had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) canned tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) New Mexico Purchasers were deprived of free and open competition; and (4) New Mexico Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

f.     As a direct and proximate result of Defendants' conduct, New Mexico Purchasers have been injured and are threatened with further injury.

g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq*., and accordingly, New Mexico Purchasers seek all relief available under that statute.

125.   New York General Business Law § 349:

a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in New York.

b.     Defendants also took efforts to conceal their agreements from New York Purchasers.

c.     Defendants' illegal conduct substantially affected New York commerce and consumers.

d.     The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in

CLASS ACTION COMPLAINT

1                 an honest marketplace in which economic activity is conducted in a

2                 competitive manner.

3     e.         As consumers, New York Purchasers were targets of the conspiracy.

4     f.         Defendants' secret agreements as described herein were not known to

5                 members New York Purchasers.

6     g.         Defendants made public statements about the price of canned tuna that

7                 Defendants knew would be seen by New York Purchasers; such

8                 statements either omitted material information that rendered these

9                 statements that they made materially misleading or affirmatively

10                misrepresented the real cause of price increases for canned tuna; and,

11                Defendants alone possessed material information that was relevant to

12                consumers, but failed to provide the information.

13     h.        Because of Defendants' unlawful trade practices in the State of New York,

14                there was a broad impact on New York Purchasers who indirectly

15                purchased canned tuna; and New York Purchasers have been injured

16                because they have paid more for canned tuna than they would have paid in

17                the absence of Defendants' unlawful trade acts and practices, and are

18                threatened with further injury.

19     i.         Because of Defendants' unlawful trade practices in the State of New York,

20                New York Purchasers who indirectly purchased canned tuna were misled

21                to believe that they were paying a fair price for canned tuna, or that the

22                price increases for canned tuna were for valid business reasons.

23     j.         Defendants knew that their unlawful trade practices with respect to pricing

24                of canned tuna would have an impact on New York Purchasers and not

25                just Defendants' direct customers;

26     k.         Defendants knew that their unlawful trade practices with respect to pricing

27                of canned tuna would have a broad impact, causing consumer class

28

CLASS ACTION COMPLAINT

members who indirectly purchased canned tuna to be injured by paying more for canned tuna than they would have paid in the absence of Defendants' unlawful trade acts and practices.

l.      During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed canned tuna in New York.

m.      New York Purchasers seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

126.   North Carolina Gen. Stat. §75-1.1 *et seq*:

a.      During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in North Carolina.

b.      Defendants also took efforts to conceal their agreements from North Carolina Purchasers.

c.      The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina Gen. Stat. §75-1.1 *et seq*., which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

e.      Defendants' unlawful conduct had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) canned tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) North

CLASS ACTION COMPLAINT

Carolina Purchasers were deprived of free and open competition; and (4) North Carolina Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

f.     As a direct and proximate result of Defendants' conduct, North Carolina Purchasers have been injured and are threatened with further injury.

g.     During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed canned tuna in North Carolina.

h.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq*., and accordingly, North Carolina Purchasers seek all relief available under that statute.

127.   Vermont Stat. Ann. Title 9, § 2451 *et seq*:

a.     During the Class Period, Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the price at which canned tuna was sold, distributed or obtained in Vermont.

b.     Defendants deliberately failed to disclose material facts to Vermont Purchasers concerning Defendants' unlawful activities and artificially inflated prices for canned tuna.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants canned tuna prices were competitive and fair.

c.     Because of Defendants' unlawful and unscrupulous trade practices in Vermont, Vermont Purchasers who indirectly purchased canned tuna were misled or deceived to believe that they were paying a fair price for canned

CLASS ACTION COMPLAINT

tuna or that the price increases for canned tuna were for valid business reasons.

d.      Defendants' unlawful conduct had the following effects: (1) canned tuna price competition was restrained, suppressed, and eliminated throughout Vermont; (2) canned tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Vermont Purchasers were deprived of free and open competition; and (4) Vermont Purchasers paid supracompetitive, artificially inflated prices for canned tuna.

e.      As a direct and proximate result of Defendants' illegal conduct, Vermont Purchasers suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.      Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Vermont Stat. Ann. Title 9, § 2451 *et seq*., and accordingly, Vermont Purchasers seek all relief available under that statute.

**Fourth Cause of Action.**

**<u>UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS</u>**

128.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

129.    Defendants have been unjustly enriched through overpayments by Plaintiffs and the Class members and the resulting profits.

130.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and the Class members

in the following states: Arizona, California, District of Columbia, Iowa, Maine, Michigan, New Mexico and South Dakota.

131.    Plaintiffs and the Class members in each of the states listed above seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Classes;

B.    That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Classes;

D.    That the Court award Plaintiffs and the Classes treble damages;

E.    That the Court award Plaintiffs and the Classes attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.    That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

CLASS ACTION COMPLAINT

G.      That the Court award Plaintiffs and the Class members such other and further relief as may be deemed necessary and appropriate.

IX.   **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.


Dated: September 9, 2015                    Respectfully submitted,

                                             _/s/ Robert J. Gralewski, Jr._
                                            Robert J. Gralewski, Jr.
                                            KIRBY McINERNEY LLP
                                            600 B Street, Suite 1900
                                            San Diego, CA 92101
                                            Telephone: (619) 398-4340
                                            bgralewski@kmllp.com

                                            Timothy D. Battin
                                            Nathan M. Cihlar
                                            Christopher V. Le
                                            STRAUS & BOIES, LLP
                                            4041 Fairfax Drive, Fifth Floor
                                            Fairfax, VA 22201
                                            Telephone: (703) 764-8700
                                            Facsimile: (703) 764-8704
                                            tbattin@straus-boies.com
                                            ncihlar@straus-boies.com
                                            cle@straus-boies.com

                                            Mario N. Alioto (56433)
                                            Lauren C. Capurro (241151)
                                            TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
                                            2280 Union Street
                                            San Francisco, CA 94123
                                            Telephone: (415) 563-7200
                                            Facsimile: (415) 346-0679
                                            laurenrussell@tatp.com

                                            *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT